# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

ELIZABETH MCNEIL,

                Plaintiff,

v.

DHH LLC, *doing business as* DAVID
HOBBS HONDA,

                Defendant.

Case No. 17-CV-1184-JPS

**ORDER**

## 1.      INTRODUCTION

Plaintiff alleges that while employed by Defendant, she was incessantly sexually harassed by her supervisor, Thomas Dulaney ("Dulaney"). (Docket #14 at 2–4). Plaintiff rebuffed his advances for months. *Id.* at 4–6. Eventually, she complained to upper management, which confronted Dulaney about his behavior and told him to stop. *Id.* at 6–7. At that point, Plaintiff maintains that Dulaney began a campaign of retaliation against her which ultimately led to her being unjustifiably sent home one day, after which she did not return. *Id.* at 7–9. Plaintiff sues Defendant under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"). She brings claims of a sexually hostile work environment, quid pro quo sexual harassment, retaliation, and a claim of constructive discharge (which, unlike the others, is not expressly grounded in Title VII). *Id.* at 10–13.

On March 30, 2018, Defendant filed a motion for partial summary judgment as to Plaintiff's second, third, and fourth claims. (Docket #18). Defendant admits that disputes of fact preclude pre-trial disposition of the

hostile work environment claim. (Docket #19 at 6 n.2). Plaintiff responded to the motion on April 30, 2018, (Docket #25), and Defendant replied on May 14, 2018, (Docket #30). For the reasons explained below, Defendant's motion must, in most material respects, be denied.

## 2. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A "genuine" dispute of material fact is created when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court construes all facts and reasonable inferences in a light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016).

In assessing the parties' proposed facts, the Court must not weigh the evidence or determine witness credibility; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chicago Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010). Internal inconsistencies in a witness's testimony "'create an issue of credibility as to which part of the testimony should be given the greatest weight if credited at all.'" *Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1170 (7th Cir. 1996) (quoting *Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1986)). The non-movant "need not match the movant witness for witness, nor persuade the court that [its] case is convincing, [it] need only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994).

### 3.    RELEVANT FACTS

The following facts are material to the disposition of Defendant's motion. They are drawn from the parties' factual briefing, (Docket #28 and #32), unless otherwise noted.[1] In accordance with the standard of review, the facts are presented in a light most favorable to Plaintiff. This means that much of Dulaney's testimony (and others aligned with Defendant) must be discounted as contrary to that of Plaintiff. In the interest of brevity, the Court will only discuss the most salient disputes of fact.

Defendant is a car dealership in Glendale. It is divided into various departments, including sales, service, business development ("BDC"), and administration. Defendant generally employs ten to fourteen salespeople and two to three sales managers. A general sales manager oversees the entire sales department. Though their duties are focused elsewhere, a general sales manager has the power to directly supervise, discipline, and/or fire salespeople should they choose. The general sales manager reports directly to Greg Hobbs ("Hobbs"), who runs the business on behalf of his father David.[2]

In 2013, Plaintiff was looking for a new job; her current employer had moved its offices outside the range of a reasonable commute. Through

---

[1]Along with its reply brief and response to Plaintiff's statement of facts, Defendant filed a "reply" in support of its own statement of facts. (Docket #31). This form of pleading is not permitted by the federal or local rules governing summary judgment motions. *See* Fed. R. Civ. P. 56; Civ. L. R. 56. It has, therefore, been entirely disregarded.

[2]At times, the parties note various changes in Defendant's operations since Plaintiff's departure. For instance, the general sales manager now reports to a general manager for certain issues, and to Hobbs for other matters. (Docket #27-3 at 28:13-22). Unless stated otherwise, the Court confines its discussion to Plaintiff's tenure with Defendant.

her son, who worked in Defendant's service department, she learned of a position in the BDC. Though she had no experience in the dealership industry, Plaintiff applied for the job and was hired in July 2013. In her work in the BDC, Plaintiff sold vehicles over the phone and brought customers into the dealership.

In light of her aptitude for this work, and at the encouragement of a supervisor, Plaintiff moved to the sales department near the beginning of 2014. Salespeople work on a commission-only basis. They are provided a draw each month but must cover that with commissions. New salespeople are also promised a base salary for the first few months while they learn about the vehicles they sell and Defendant's sales procedures. Plaintiff took the guaranteed salary for a short time but her commissions soon exceeded that sum.

When Plaintiff transitioned to sales, the general sales manager was Stuart Krumm ("Krumm"). Dulaney was hired in late March 2014 as a sales manager. In June 2014, Krumm left Defendant's employ and Dulaney took over as the general sales manager. Dulaney's initial interactions with Plaintiff showed interest in getting to know her on a personal level. Dulaney also encouraged Plaintiff to meet with him outside the dealership setting. Plaintiff was not comfortable with this suggestion and thought such a meeting would be inappropriate. She tried to deflect Dulaney towards a group meeting with her and other employees, but he was only interested in a one-on-one outing with Plaintiff.

Following that initial invitation, Dulaney continued to approach Plaintiff with uncomfortably personal questions. These conversations included more requests to see Plaintiff outside of work, such as telling Plaintiff that they should "get together" or that Dulaney would take her out

to dinner. Though Plaintiff made it clear that she did not date co-workers, particularly supervisors, Dulaney was undeterred, and responded that their work relationship would not be a problem.

Despite Plaintiff's consistent rejections, Dulaney ramped up the pressure on her. He asked her why she would not see him outside of work while insisting that such a meeting was a good idea. Dulaney said that the two would be a good fit together. He also suggested that she come over to his home for dinner because he was a good cook. In total, Dulaney asked Plaintiff out on romantic dates approximately fifteen to twenty times.[3] Plaintiff always answered with a "no" or some other form of rejection.

Dulaney's comments strongly implied the sexual nature of his advances. He variously told Plaintiff that they should have a romantic evening, intimate dinner, or a nice night together. Dulaney asked whether Plaintiff's son, with whom she lived at the time, would be uncomfortable if she did not return home one evening. He further asked Plaintiff if she was a sensual woman. Dulaney also commented on Plaintiff's appearance, stating that she looked great, particularly for someone of her age, and at one time mentioned her clothing and asked if she was trying to look sexy.

When Dulaney would approach Plaintiff, he would do so at her desk and speak to her in hushed tones. He repeatedly told Plaintiff that she should not disclose his advances to Defendant's other employees. Despite his efforts towards discretion, other employees noticed Dulaney hovering around Plaintiff and speaking quietly to her. Plaintiff's co-workers began

---

[3]Defendant objects to the purported hearsay testimony of Plaintiff's former co-workers on this point. (Docket #32 ¶ 21). It is of no moment; Plaintiff herself testified to the fact and she need not present corroborating evidence at the summary judgment stage.

jokingly referring to her as "Mrs. Dulaney" or to Dulaney as Plaintiff's boyfriend.

Defendant's sexual harassment reporting policy generally provides that the aggrieved employee should report the problem to a manager or Hobbs himself. Plaintiff sensed that her rejections were beginning to irritate Dulaney. Plaintiff worried that if she reported Dulaney's behavior, and someone confronted him, there would be negative repercussions for her. Indeed, another sales manager described Dulaney as vindictive.

Despite her concerns, at a company party in mid-August 2014, Plaintiff spoke with Hobbs and a co-worker about Dulaney's advances. Plaintiff told them that Dulaney was making her very uncomfortable. Plaintiff also mentioned that she was afraid that Dulaney would become angry if she continued to reject him. Hobbs asked Plaintiff what she wanted him to do about it, but Plaintiff said she did not know.

Plaintiff also complained to other management personnel. Jeannie Shetler ("Shetler") is Hobbs' sister-in-law and served as Defendant's IT manager. Brett Dumstrey ("Brett") was a sales manager. Jeremy Olson ("Olson") was a financial manager. Plaintiff told Shetler, Brett, and Olson about Dulaney's conduct. Brett alone confronted Dulaney about the matter. Dulaney responded by threatening to fire him. In August 2014, Brett also told Hobbs about Dulaney's advances on Plaintiff, but Hobbs did not take immediate action.

Instead, based on the conversation at the August 2014 party, Hobbs spoke with Dulaney in mid-September. Hobbs asked that Dulaney maintain a professional relationship with Plaintiff. Dulaney denied wrongdoing and Hobbs did nothing further to address the matter. After that meeting, Dulaney did not continue to ask Plaintiff out on dates.

At that time, however, Plaintiff noticed a significant shift in Dulaney's behavior. He became hypercritical of her job performance and was generally angry and verbally abusive towards her. Plaintiff felt that this behavior was directed at her more than any other employee. Plaintiff became miserable at work and feared Dulaney's almost daily outbursts at her. During one such instance, Olson interrupted and pulled Plaintiff into his office. Olson said he wanted to "break that up" and joked with Plaintiff, stating "why don't you just fuck him and get it over with, ha ha ha." (Docket #27-1 at 110:25-111:15).[4]

Plaintiff's sales began to decline in October 2014. From December 2014 to February 2015, Plaintiff sold just six cars each month, resulting in monthly commissions of between $1,500 to $2,500. This caused Plaintiff substantial financial hardship. In fact, she had to borrow money from friends and family to meet her living expenses. Defendant asserts that Plaintiff's sales throughout her tenure were relatively consistent. *See* (Docket #32 ¶ 100) (chart of Plaintiff's sales and earnings from March 2014 through April 2015). Defendant notes that Plaintiff sold between six and fourteen cars for the majority of the months she was employed as a salesperson. Plaintiff counters that her low point—selling six cars a month, three months in a row—was particularly harmful to her. A difference of just a few sales in a month could, and did, cause great financial strain.

During this slow sales period, Plaintiff was sometimes unable to cover her draw for a month with commissions. On a few occasions, Dulaney advanced some of Plaintiff's draws at her request. After a number of such

---

[4]Though this quotation comes from Plaintiff's testimony, Defendant did not object to the hearsay nature of the statement.

requests, Dulaney told Plaintiff to go to Hobbs directly for draw advancements. In January 2015, Plaintiff met with Hobbs. Though Defendant suggests that this meeting was about only financial issues, Plaintiff says otherwise. During the meeting, Plaintiff again complained about Dulaney's harassment, and now asserted that Dulaney was retaliating against her for her repeated rejections. Plaintiff said that Dulaney interfered with her receipt of sales leads, that he was verbally abusive and angry with her, and that he was negatively influencing her working conditions. Hobbs continued to do nothing and characterized Plaintiff's complaints as mere whining.[5]

Plaintiff supplies additional detail about the other forms of alleged retaliation mentioned in the January meeting. First is the leads issue. Sales leads come to Defendant's salespeople through various sources. These include manager leads and BDC leads which are distributed by managers. Manager leads could come from personal referrals or people who called the dealership looking to speak directly with a manager. BDC leads come to the dealership after a customer sets an appointment with the BDC department. BDC leads averaged 180-200 per month, which was approximately 40%-50% of the total leads each month. Those leads were generally distributed based upon who greeted the customer at the door or the sales desk. About ten percent of those customers would end up speaking directly with a

---

[5]In February 2015, Defendant hired a consulting firm to train its salespeople. In meetings with the consultant, the salespeople complained about the level of respect they were afforded by sales managers. Plaintiff says she experienced a negative backlash from the sales management team for her participation in those complaints. Though the parties quibble over the details of this event, the Court questions its relevance. It seems to be far less important than Dulaney's other discriminatory conduct.

manager, who would then pass them along to a salesperson. Plaintiff says that these are both substantial and valuable sources for leads, while Defendant discounts their importance and volume.

Prior to September 2014, Plaintiff would receive one to three manager leads per week, resulting in three to five sales per month. After that time, Dulaney told Plaintiff that she would not be getting any more manager leads, and the leads indeed dropped to almost zero. Defendant counters that Plaintiff was not given leads because she had received an advance on her commissions. Plaintiff rejoins that from September 2014 until April 2015, she covered her advances all but a few times, and yet still received no manager leads. Additionally, the assignment of the manager-assisted BDC leads was supposed to be non-discriminatory, but Plaintiff maintains that Dulaney told his sales managers not to give those leads to her either.

The service department also generates leads. Plaintiff would receive service leads from her son and others in the service department, though these were not as numerous or valuable as manager or BDC leads. In total, Defendant realized about forty service leads per month. Plaintiff asserts that Dulaney instructed service employees not to give leads to her. Defendant objects that this is both hearsay and factually incorrect; Dulaney told the service department to give all leads to the general sales manager so that they could be distributed equitably. Dulaney further stated that the new policy attempted to resolve the perceived unfairness of Plaintiff receiving leads directly from her son. Plaintiff responds that this reasoning was mere pretext. The suspicious timing of Plaintiff's leads drying up and the new service lead policy suggests that Dulaney did indeed wish to retaliate. Further, even if the service leads fell into the hands of the sales

managers, they would not send any to her at Dulaney's direction. Like her manager and BDC leads, Plaintiff's sales leads fell to almost nothing.

Defendant notes that the remaining half of leads for salespeople came from the salesperson's own efforts at greeting customers at the dealership and tracking down prospective buyers by phone. Overall sales during December, January, and February are usually quite poor. In her deposition, Plaintiff conceded that her sales during those months in the 2014-15 timeframe were near the average for Defendant's other salespeople. Even so, Plaintiff contends that her sales were artificially deflated by Dulaney's retaliatory actions. For instance, though her sales increased somewhat in March 2015, they went right back down to winter levels in April 2015.

The second form of alleged retaliation was a desk reassignment. The salespersons' desks are arranged in a half-moon shape in Defendant's facility, with each end near a customer entrance. Plaintiff was initially positioned near one of the entrances. This allowed her to greet customers and she felt it was better for sales. Defendant claims that all desk positions, from the ends to those in the middle, had benefits and costs. Defendant attempts to further soften the desk reassignment concern by noting that salespeople are not required to sit at their desks. Indeed, salespeople who were up and about around the dealership got customers whom they met. Plaintiff counters that salespeople are required to make a certain number of phone calls per day, and their phone is at their desk.

The desk assignments were redistributed in September or October 2014. Plaintiff was moved towards the middle of the semi-circle. Dulaney says this was done based on some objective criteria, such as sales and greeting customers. Plaintiff again claims pretext. She further notes that

"attitude" was a factor in the move. Dulaney told Plaintiff point-blank that the desk reorganization was her fault, due to her poor attitude and performance. Defendant also notes that another female salesperson, Catherine Dumstrey ("Catherine"), was moved from the end to the middle of the desk arrangement. Defendant claims this was because Catherine was overly talkative, while Plaintiff suggests that Dulaney was discriminating against her as well. *See* (Docket #27-5 at 15:10-24, 52:3-15) (Catherine testified that Dulaney did not seem to like her, was overly demanding of her job performance, and commented on her appearance).

Plaintiff admits that by April 2015, she believed things had calmed between her and Dulaney. However, the issues between them came to a head on April 29, 2015. That day, Plaintiff was sitting at her desk when a customer walked in. Dulaney says that salespeople are required to greet customers entering the showroom, and that Plaintiff failed to do so in this instance. Plaintiff responds that the greeting "rule" is not so stringent, and in any event, she did not notice the customer enter.

Dulaney angrily confronted Plaintiff for this supposed error. Plaintiff explained herself but Dulaney did not believe her. Plaintiff says that Dulaney reprimanded her alone, though there were other salespeople at their desks who also did not greet the new customer. At the end of the conversation, he told her to go home early. Plaintiff believed that this meant she may have been fired. Plaintiff did not clean out her desk but did take her personal effects with her as she left.

On her way out, Plaintiff had a conversation with her co-worker Mary Rutowski ("Rutowski"). Plaintiff learned that Rutowski and another female co-worker, Angela Van De Zande ("Van De Zande") had also been sexually harassed by Dulaney. Dulaney had made lewd, graphic comments

to Rutowski. When Hobbs was notified of this, he determined that the words used did not sound like something that Dulaney would say, and so found that Rutowski was not credible. As for Van De Zande, she met with Defendant's human resources manager to discuss Dulaney's harassment.[6] Hobbs admits that he did not respond to Van De Zande's complaint. Dulaney was never disciplined for his conduct towards Plaintiff, Rutowski, or Van De Zande.

Plaintiff was not scheduled to work the next day, April 30. That day, she sent an e-mail to Hobbs. The e-mail reads:



**Greg Hobbs**

From: Greg Hobbs
Sent: Friday, May 01, 2015 10:28 AM
To: Lisa McNeil
Subject: RE: Was I fired yesterday?

Lisa,
You were not fired yesterday, or the day before. This is not something I wish to discuss via email. So we look forward to seeing very soon, hopefully before two today.
Thanks

*Greg Hobbs.*

**A Dealer _for_ the People.**
Because everybody deserves to drive a nicer, newer vehicle
6100 N. Green Bay Ave. Glendale, WI. 53209
**414-716-1044.**
hobbshonda.com

EXHIBIT
3

From: Lisa McNeil
Sent: Thursday, April 30, 2015 8:25 AM
To: Greg Hobbs
Subject: Was I fired yesterday?

Dear Greg,

I think I have been a consistently responsible/loyal employee for two years. I've also taken the initiative to work out challenges that I had with Tom over some months after our talk, and without bothering or involving you. That is not the purpose of my writing you at this point. It's not a problem with Tom per se, but a management problem/style that I have a huge issue with, and I believe you should address.

Yesterday, a customer came in the north entrance to the showroom. I am at 4 o'clock to the south door, and with a couple of vehicles between me and the north door. While I cannot account for other salespeople on the floor, I can say that I saw this customer by the time she reached the tower and immediately walked over. There were, I believe, 4 sales managers at the tower and Butch had already greeted her. I saw then that she was Alex's customer. Butch was speaking to her, and I waited, as we do for instruction or introduction. She got into the Fit with her young daughter, and Alex was then engaged with her. I remained at the tower, and Tom sternly said, "Why didn't a single salesperson greet this customer?" I responded that

---

[6]Plaintiff offers a memorandum and some notes from the human resources manager which describe her conversation with Van De Zande. (Docket #33-8 at 10–11). She did not depose the manager but seeks to introduce the documents through Van De Zande's testimony. (Docket #32 ¶ 93). This error means that the statements in the documents are, at the summary judgment stage, inadmissible hearsay.

when I saw her, I walked up. He said I did not. I said that was why I got up from my desk. To which he said I was giving him "lip" and told me if I didn't like it, I should go home and not come back. He did so in front of the customer. I am certain that the managers that were congregated will all have the viewpoint that a customer was not greeted by a salesperson, as they should. But, apparently, I was not able to get to her in time, am guilty, and have no right to explain that I did get up to help when I saw her.

Greg, I do not have an unchecked temper, and have been in business for over 35 years. In that time, I have never been sent home like a grade school student. It's beyond unprofessional, and goes to the heart of the disrespect that runs rampant at times between managers and sales staff. I am well aware that there are incidents of no greeting by sales of people who walk into the showroom. But, I make my best effort to greet, assist, and make DHH a friendly, and welcoming place. I think my record of customer satisfaction is unparalleled, and if you asked anyone from the techs, to sales staff, you would hear that I engage everyone.

When the managers have a bad day, or time frame, when one staff member is remiss - this poison flows to everyone. I get it - we are a team. But, sending me home on the last two days of the month because I was defending my intentions is not management. It is punitive, and dictatorial crap that I have not encountered since grade school.

I don't know if I am not to come back, or will be notified of my plight. I don't even know if I want to work in an atmosphere like that, but for the fact that I care deeply about my job, and the dealership.

Respectfully,

Lisa

(Docket #27-1 at 113–14). Defendant notes that the e-mail omits any reference to sexual harassment or retaliation. It also mentions that things had become "tolerable" between Plaintiff and Dulaney. Plaintiff counters that her intention was to address what had happened the day before, not air out her concerns with Dulaney's harassment and retaliation generally.

Hobbs' response, copied above Plaintiff's e-mail, was that Plaintiff had not been fired. Hobbs said that "we" look forward to seeing Plaintiff at work, which Plaintiff took to mean that she would have to meet with both Hobbs and Dulaney about her complaints. She felt that it would be intolerable to return to work under these circumstances. In her deposition, Plaintiff explained that she felt that she was worn out from the harassment and retaliation, that she did not want to face Dulaney, and that she was unsatisfied with Hobbs' handling of the matter. Plaintiff did not return to work or otherwise communicate with Hobbs again.

4.    **ANALYSIS**

Title VII prohibits discrimination in employment on the basis of a person's race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a)(1). Sexual harassment by co-workers and supervisors falls within the ambit of conduct proscribed by Title VII. *See Meritor Sav. Bank, FSB v.*

*Vinson*, 477 U.S. 57, 63–67 (1986). As noted above, Plaintiff presents four claims: 1) hostile work environment, 2) quid pro quo harassment, 3) retaliation, and 4) constructive discharge. The Court will begin by addressing the basic elements of each cause of action.

A hostile work environment claim requires Plaintiff to prove that "(1) she was subjected to unwelcome sexual harassment; (2) the harassment was based on her sex; (3) the sexual harassment unreasonably interfered with her work performance by creating an intimidating, hostile or offensive work environment that affected seriously the psychological well-being of the plaintiff; and (4) there is a basis for employer liability." *McPherson v. City of Waukegan*, 379 F.3d 430, 437–38 (7th Cir. 2004). Such an environment is created by "conduct so severe or pervasive as to alter the conditions of employment and create an abusive working environment." *Id.* at 438. It is difficult to draw the line between actionably "harassing" and "merely objectionable" conduct. *Id.* The trier of fact must consider "the frequency and severity of the conduct; whether it was threatening and/or humiliating or merely an offensive utterance; and whether the harassment unreasonably interfered with [the plaintiff's] work." *Id.* Defendant concedes that Plaintiff's evidence raises a jury question as to whether Dulaney's harassment rose to the level of an abusive working environment which interfered with Plaintiff's work. (Docket #19 at 15–16).

Quid pro quo sexual harassment occurs when "submission to sexual demands is made a condition of tangible employment benefits." *Bryson v. Chicago State Univ.*, 96 F.3d 912, 915 (7th Cir. 1996). This can entail harassment which becomes a condition of the employee's continued employment or when the employee's acquiescence (or lack thereof) to sexual advances is used as a basis for employment decisions. *Id.* To prevail

on a claim of quid pro quo harassment, the employee must prove "(1) that she or he is a member of a protected group, (2) the sexual advances were unwelcome, (3) the harassment was sexually motivated, (4) the employee's reaction to the supervisor's advances affected a tangible aspect of her employment, and (5) respondeat superior has been established." *Id.* Title VII also protects employees from retaliation for complaining about discrimination. An employee can make out a claim of retaliation when "1) she engaged in a statutorily protected activity; (2) the [defendant] took a materially adverse action against her; and (3) there existed a but-for causal connection between the two." *Nicholson v. City of Peoria, Ill.*, 860 F.3d 520, 523 (7th Cir. 2017) (quotation omitted).

Defendant's motion focuses on two aspects of Plaintiff's case. First, Defendant argues that Plaintiff was not made to endure actionably adverse employment actions. Second, even if she had, Defendant maintains that there is insufficient evidence of discriminatory intent which motivated those actions. The Court will address each of the allegedly adverse actions in turn.

### 4.1 Constructive Discharge

Constructive discharge qualifies as a tangible, adverse employment action to satisfy those elements of hostile work environment and quid pro quo claims. *See Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010); *Murray v. Chicago Transit Auth.*, 252 F.3d 880, 887–890 (7th Cir. 2001). Plaintiff's claim of constructive discharge, based on the events leading to and through the April 29 incident, is the centerpiece of her case. Constructive discharge occurs "when, from the standpoint of a reasonable employee, the working conditions become unbearable." *Wright v. Ill. Dep't of Children & Family Servs.*, 798 F.3d 513, 527 (7th Cir. 2015). As is clear by

the reference to a "reasonable" employee, this is an objective standard. *Levenstein v. Salafsky*, 414 F.3d 767, 774 (7th Cir. 2005).

Conditions can become unbearable in two ways: 1) the harassment is so severe that the employee has no choice but to quit, or 2) the employer acts in a manner which a reasonable employee would interpret as signaling that she will be fired. *Id.* Though the evidence might support an argument in favor of both theories, Plaintiff's brief advances only the former iteration. (Docket #25 at 15). To succeed on this ground, Plaintiff must demonstrate that her working conditions became "intolerable." *Chapin*, 621 F.3d at 679. Once she shows that she was constructively discharged, Plaintiff must then connect the discharge to the applicable discriminatory intent (here, sex). *E.E.O.C. v. Univ. of Chicago Hosps.*, 276 F.3d 326, 333 (7th Cir. 2002). Constructive discharge is difficult to establish; "to support such a claim, a plaintiff's working conditions must be even more egregious than the high standard for hostile work environment claims." *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 789 (7th Cir. 2007). "[T]he primary rationale" for this "is to permit an employer to address a situation before it causes an employee to quit." *Id.* at 790.

Plaintiff has done enough, if just enough, to raise a jury question as to whether she was constructively discharged. Viewing the evidence in her favor, including all reasonable inferences, Plaintiff experienced a consistent campaign of harassment, and then retaliation, based on her sex. She also made multiple complaints to Hobbs about these issues, but these did not solve the problem. This is not to say that Plaintiff has come close to proving constructive discharge. As this Court has observed in an analogous context, a request for summary judgment on a difficult-to-prove claim "present[s] an interesting confluence of burdens." *Wis. Local Gov't Prop. Ins. Fund v.*

*Lexington Ins. Co.*, No. 15-CV-142-JPS, 2017 WL 4998158, at *10 (E.D. Wis. Oct. 31, 2017). While Plaintiff must ultimately shoulder the heavy burden of establishing constructive discharge, at this stage, she need only offer a set of facts, and inferences therefrom, from which a reasonable jury *could* find that it occurred. While the Court is certainly not convinced based on the evidence presented, it need not be for Plaintiff to proceed to trial. *See Waldridge*, 24 F.3d at 921.

Defendant offers three arguments to the contrary, but none has merit. First, it maintains that Plaintiff's scenario falls short of what the Court of Appeals has deemed intolerable. This includes harassment which compelled the victim to attempt suicide, *Snider v. Consolidation Coal Co.*, 973 F.2d 555, 557 (7th Cir. 1992), and a physical assault and death threat, *Brooms v. Regal Tube Co.*, 881 F.2d 412, 417 (7th Cir. 1989).

On the other hand, the Seventh Circuit has determined that a reasonable employee would not feel compelled to resign when a co-worker made a "single oblique threat" to "pop a cap in [his] ass." *Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1046, 1050 (7th Cir. 2000).[7] In *Cooper-Schut v. Visteon Automotive Systems*, the Court of Appeals held that the black, female plaintiff experienced relatively "mild" harassment when various

---

[7]Defendant also cites *Witte v. Wisconsin Department of Corrections*, 434 F.3d 1031 (7th Cir. 2006), as an example of conduct which would not support a claim of constructive discharge. There, Witte "was subjected to a steady barrage of false allegations and petty charges and sham investigations and pre-disciplinary proceedings," which caused him "relentless stress and anxiety." *Id.* at 1036. The court rested its holding on Witte's failure to properly dispute factual assertions on summary judgment, *id.* at 1036–37, and the lack of evidence that the defendants' repeated investigations were meant to harass rather than legitimate responses to complaints, *id.* at 1037. *Witte* thus has little to say on where to draw the line for conduct which might compel a reasonable employee to resign.

white, male co-workers made racist and sexist comments to or near her over the course of four months. 361 F.3d 421, 424–25, 428–29 (7th Cir. 2004); *see also Harriston v. Chicago Tribune Co.* , 992 F.2d 697, 699–700, 705 (7th Cir. 1993) (a black female employee was not constructively discharged in the face of "such forms of discrimination as being excluded from office activities, being reprimanded without reason, and being given one of the least lucrative sales territories, as well as not being assigned new accounts, not being allowed to supervise two white employees, and not being assisted by [her supervisor]"); *Gawley v. Ind. Univ.*, 276 F.3d 301, 315–16 (7th Cir. 2001) (employee could not prove that quitting was her only recourse when she waited seven months to avail herself of the employer's formal harassment complaint procedures, after she informally asked her supervisor to stop on many occasions).

While these opinions are useful in assessing the severity of Plaintiff's scenario, none are so alike to hers that they demand that Plaintiff's constructive discharge theory be rejected at this stage. Plaintiff herself offers the *Boumehdi* case as analogous authority. Boumehdi was subjected to sexually harassing commentary from her male supervisor over a ten-month period. *Boumehdi*, 489 F.3d at 786. She complained to human resources, but the supervisor found out and began to retaliate. *Id.* Among other things, he threatened Boumehdi with undesirable work assignments, gave her poor reviews, and unfavorably altered her schedule. *Id.* at 786–87. These actions affected Plaintiff's pay and work environment. *Id.* In fact, Boumehdi's pay was inappropriately docked by the supervisor for months. *Id.* She complained repeatedly to human resources over the course of six months, but nothing changed. *Id.* With no meaningful response from management,

Boumehdi resigned, leaving a note which indicated that her work environment had become intolerable. *Id.* at 787.

The court found that summary judgment was inappropriate on Plaintiff's claims relating to constructive discharge and retaliation. *Id.* at 788–94. On constructive discharge, Boumehdi had "alleged a repeated pattern of offensive conduct by her supervisor, retaliatory actions after she complained to human resources, and her employer's general failure to respond despite repeated complaints." *Id.* at 790. Though employees have a duty to wait for their employer to intervene, the court noted that employers likewise have a duty to do so and prevent the supervisor's harassment. *Id.* Despite the employer's "numerous opportunities to respond to the situation, Boumehdi's alleged complaints fell on deaf ears." *Id.* As to retaliation, Boumehdi marshalled sufficient evidence that she complained about her supervisor's conduct and suffered his resulting wrath. *Id.* at 792–93.

Plaintiff's facts are undoubtedly less severe than Boumehdi's, but they are sufficiently similar that judgment as a matter of law is foreclosed. Like Boumehdi, Plaintiff experienced months of sexual harassment. Indeed, while the *Boumehdi* supervisor's comments were mostly "sexist rather than sexual," Dulaney's were expressly aimed at beginning a sexual relationship with Plaintiff. When Plaintiff complained, Dulaney's harassment ended and his retaliation began. With no end to the retaliation in sight, and particularly in light of the April 29 incident, a jury could find that Plaintiff's continued employment had become intolerable.

Defendant stresses that Plaintiff should have given it a better opportunity to address her concerns. "[A]n employee has not acted reasonably" in quitting in light of difficult working conditions "if she

assumes the employer will fail to protect her without allowing the employer a chance to try." *Cooper-Schut*, 361 F.3d at 429. Defendant asserts that Plaintiff reported Dulaney's retaliation only once in the January 2015 meeting. Defendant has not, however, shown that more than one complaint was necessary. Taking Plaintiff's testimony as true, the January 2015 meeting did nothing to abate Dulaney's conduct. While Boumehdi apparently made more consistent grievances than Plaintiff, that does not mean that Boumehdi's conduct sets the bar for constructive discharge claims. Plaintiff is entitled to offer her timeline and description of events to the jury, which will decide whether a reasonable employee would have had no choice but to resign.

Defendant's second argument is that Plaintiff's own communications may have indicated that she believed the situation with Dulaney was better by the spring of 2015. (Docket #19 at 22–23; Docket #30 at 11) (Defendant cites to Plaintiff's April 30 e-mail in its opening brief and reply). However, Plaintiff's subjective beliefs are irrelevant to the objective determination of constructive discharge. *Levenstein*, 414 F.3d at 774. Even if this were untrue, Plaintiff disputes the meaning of her words. Construing them in Defendant's favor, this argument might have persuasive value for a jury. At this stage it has no bearing.

Defendant's final attempt to defeat constructive discharge is to attack causation. There are two problems with Defendant's approach. First, its opening brief says almost nothing about lacking causation. (Docket #19 at 21) (Defendant asserts that Plaintiff cannot prove that discrimination caused her discharge, while offering no citations or argument on the matter). The Court thus finds the argument waived. *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) ("[P]erfunctory and

undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived[.]").[8] Second, causation is generally a question for a jury. *Shick v. Ill. Dep't of Human Servs.*, 307 F.3d 605, 615 (7th Cir. 2002). This is particularly important in employment discrimination cases, which "often involve sensitive and difficult issues of fact, and plaintiffs often have only circumstantial evidence on which to rely." *Tart v. Ill. Power Co.*, 366 F.3d 461, 472 (7th Cir. 2004). The Court finds no reason to depart from this approach.

### 4.2    Lead Reduction and Desk Reassignment

With the survival of the constructive discharge theory, each of Plaintiff's claims could go to the jury. Defendant nevertheless seeks to limit what the jury will hear about Dulaney's retaliatory conduct. It maintains that the allegedly discriminatory lead reduction and desk reassignment should not be presented to the jury. As with constructive discharge, Defendant attacks both the gravity of the actions and their causal relationship with Dulaney's discrimination.

For both quid pro quo and retaliation claims, the employee must demonstrate a "tangible" or "material" adverse employment action. These terms are essentially interchangeable. *Phelan v. Cook Cnty.*, 463 F.3d 773, 785 n.5 (7th Cir. 2006) *overruled on other grounds by Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 764 (7th Cir. 2016). The Supreme Court describes tangible employment actions as creating "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Penn. State Police v. Suders*, 542 U.S. 129, 144 (2004)

---

[8]Even in reply, Defendant mentions the position in a single paragraph which is similarly conclusory. (Docket #30 at 11–12).

(quotation omitted). Such actions reflect the supervisor's use of their position in the company to inflict harm on the employee. *Id.*

Materially adverse actions are those where a reasonable employee "would be dissuaded from engaging in the protected activity." *Roney v. Ill. Dep't of Transp.*, 474 F.3d 455, 461 (7th Cir. 2007). "[N]ot everything that makes an employee unhappy is an actionable adverse action," however. *Madlock v. WEC Energy Grp., Inc.*, 885 F.3d 465, 470 (7th Cir. 2018) (quotation omitted). The action must involve a major change to "the [plaintiff's] current wealth, h[er] career prospects, or changes to work conditions that include humiliating, degrading, unsafe, unhealthy, or otherwise significant negative alteration in the workplace." *Id.* (quotation omitted).

Both terms may be satisfied by conduct which causes substantial economic injury to the employee. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 762 (1998) ("A tangible employment action in most cases inflicts direct economic harm."); *Tart*, 366 F.3d at 475 (a materially adverse action occurs when "the employee's compensation, benefits or other financial terms of employment are diminished[.]"). The parties' competing evidence creates a dispute of fact as to whether Dulaney's actions interfered with Plaintiff's ability to earn commissions, her only source of income. Plaintiff's evidence shows that her manager and service leads were greatly reduced, and that the desk reassignment impaired her interactions with customers entering the dealership. Defendant counters that she had other sources of leads, that her desk position was not terribly important, and that the decline in Plaintiff's sales was part of the normal ebb and flow of sales during the year. The jury must sort out who is correct.

Defendant further argues that the actions were not motivated by discriminatory intent. It is critical to remember that the inquiry here is quite

simple: "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's . . . sex . . . caused the [constructive] discharge or other adverse employment action." *Ortiz*, 834 F.3d at 765. As with the constructive discharge theory, that minimal standard has been met here. Plaintiff maintains that the timing of her lead reduction and desk reassignment, when combined Dulaney's abuse towards her and his other comments, supports an inference that Dulaney took those steps because Plaintiff had complained about his harassment. *Gracia v. SigmaTron Int'l, Inc.*, 842 F.3d 1010, 1021 (7th Cir. 2016) ("Although suspicious timing alone is rarely enough to create an inference of retaliatory motive, it can sometimes raise an inference of a causal connection, especially in combination with other evidence."). The timing is as suspicious as possible—Dulaney's campaign of retaliation began immediately after his meeting with Hobbs in mid-September. *Casna v. City of Loves Park*, 574 F.3d 420, 427 (7th Cir. 2009) ("Suspicious timing is rarely enough to create a triable issue, . . . but in an extreme case like this, where the adverse impact comes on the heels of the protected activity, it is[.]") (citation and quotation omitted).

Defendant responds that each of Dulaney's decisions had a legitimate, non-discriminatory basis. Plaintiff says these are pretext. *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 565 (7th Cir. 2015) (to create a jury question on pretext, "the employee must identify such weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered reason that a reasonable person could find [it] unworthy of credence.") (quotations omitted). For example, Defendant contends that Plaintiff's loss of manager leads was in part due to her failure to cover her draw advances. Plaintiff notes that this occurred only a few times, leaving unexplained her months-

long manager lead drought. Defendant also contends that Plaintiff's friction with Dulaney was due to his management style, not any discriminatory motive. Again, all of these issues may be argued to the jury, but cannot be resolved by the Court.

### 4.3    Stand-Alone Constructive Discharge Claim

Defendant asserts that "constructive discharge" is not a stand-alone claim. (Docket #19 at 18–19), citing *Russ v. Van Scoyoc Assoc's, Inc.*, 122 F. Supp. 2d 29, 36 (D.D.C. 2000); *Vitug v. Multistate Tax Comm'n*, 88 F.3d 506, 517 (7th Cir. 1996). Rather, Defendant explains that constructive discharge, if it indeed occurred, could satisfy the adverse employment action requirements of Plaintiff's quid pro quo and retaliation claims. *Id.* at 19. Constructive discharge might also bear on her damages. *Id.*

Plaintiff questions the applicability of Defendant's citations but supplies none of her own. (Docket #25 at 20 n.12). Instead, she asserts that she "should be allowed to proceed to trial and prove that she was constructively discharged." *Id.* Plaintiff states that "it is irrelevant at this stage whether it is styled as an independent claim or subsumed in the retaliation and quid pro quo claims." *Id.* It is not clear what Plaintiff means by "at this stage"; does she refer to summary judgment specifically, or to the remainder of the case generally?

While neither party's position is presented with exceeding clarity, the better view is that of Defendant. *Vitug* identifies constructive discharge as one of many potential theories of a general discrimination claim. *Vitug*, 88 F.3d at 516–17. The Seventh Circuit's pattern jury instructions state the same. Fed. Civ. Jury Inst. of the Seventh Circuit §§ 3.01, 3.02, 3.05A, 3.11 (2017). The Court will, therefore, dismiss Plaintiff's independent claim for

constructive discharge. Plaintiff may proceed on her other claims utilizing, *inter alia*, a constructive discharge theory.

**5.   CONCLUSION**

On the evidence presented here, this is a close case. Plaintiff has just barely raised triable issues as to whether she was constructively discharged or subjected to other adverse employment actions due to her sex. That is the end of the Court's inquiry. The Court is not the trier of fact and, at this stage, is bound to view the evidence in a light most favorable to Plaintiff. The jury must be allowed to determine whether Plaintiff can actually prove her claims without the benefit of this standard of review.

Accordingly,

**IT IS ORDERED** that Defendant's motion for partial summary judgment (Docket #18) be and the same is hereby **GRANTED in part** and **DENIED in part** in accordance with the terms of this Order; and

**IT IS FURTHER ORDERED** that Plaintiff's stand-alone claim for constructive discharge (Docket #14 at 13) be and the same is hereby **DISMISSED**.

Dated at Milwaukee, Wisconsin, this 6th day of June, 2018.

BY THE COURT:

J. P. Stadtmueller
U.S. District Judge